UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

JESSE BLANCO,                           :
            Plaintiff,                   :
                                        :
      v.                                 :          No. 5:20-cv-02072
                                        :
CITY OF READING,                         :
            Defendant.                   :

_____

**O P I N I O N**
Defendant's Motion to Dismiss, ECF No. 9 - Granted

**Joseph F. Leeson, Jr.**                                    **March 26, 2021**
**United States District Judge**

## I.      INTRODUCTION

Plaintiff Jesse Blanco initiated this action against his former employer, the City of

Reading, alleging that he was unlawfully terminated after complaining of racial discrimination

and seeking FMLA leave.  The City of Reading has filed a Motion to Dismiss all claims.  For the

reasons set forth below, the Motion to Dismiss is granted.

## II.     BACKGROUND

The Amended Complaint alleges as follows: Blanco, who is part African American, part

American Indian, and part Caucasian, was hired as a carpenter by the City of Reading ("the

City") in September 2015.  Am Compl. ¶¶ 5-6, ECF No. 6.  Around the summer of 2018, Blanco

was recommended to be acting foreman, but his "older white coworkers were not pleased."  *Id.*

¶¶ 11-13.  Blanco's supervisor changed in April 2019, at which time he was "again"[1] made

_____

[1]      The Court infers from Blanco's use of the word "again" that he was not only
"recommended" to be acting foreman previously but was acting foreman.  *See* Am. Compl. ¶¶
11-16.  In Blanco's response to the Motion to Dismiss, he states that his "promotion [in 2018]
made his older white coworkers unhappy."  Resp. 4, ECF No. 12 (citing Am. Compl. ¶ 13(A)).

acting foreman.  *Id.* ¶¶ 14-16.  The following month, after the Mayor was defeated in his bid for reelection, Blanco began experiencing "significant stress" due to shifting alliances.  *Id.* ¶ 18. Blanco was also stressed after the election in November 2019 and the Director of Public Works announced he was leaving.  *Id.* ¶ 23.  In December 2019, "in an effort to keep his employment. . . [Blanco] was examining available City positions."  *Id.* ¶ 24.

During the second week of December 2019, Blanco expressed his interest in the Chief Building Official position to the Head of Purchasing Jamar Kelly, who advised Blanco to speak with the Head of Human Resources.  *Id.* ¶¶ 24-26.  Blanco was thereafter advised to speak with the Head of Community Development, who informed Blanco that the position would require him to obtain certifications.  *Id.* ¶ 27.  She also told Blanco that she would help him find classes when he stated he was willing to obtain the certifications.  *Id.* ¶ 28.  A few days later, the Head of Community Development advised Blanco that "the powers that be" wanted him to submit his resume.  *Id.* ¶¶ 26-29.  A week later, the Head of Human Resources asked Blanco if he wanted the job, to which Blanco responded yes.  *Id.* ¶ 30.

Just before Christmas 2019, Blanco was advised that Jamar Kelly was holding things up and the older white workers in Building Inspection were "Livid!"  *Id.* ¶ 31.  Blanco then saw Kelly, who stated he had an "in" with the new Mayor and taking the job was not looking good. *Id.* ¶ 33.  Kelly advised Blanco that he could do something for Blanco later.  *Id.* ¶ 34.  Blanco thereafter spoke with his boss, who relayed that she thought the position was a good move and that the Mayor, the Managing Director, the Head of Human Resources, and the Head of Community Development all thought Blanco would be a great fit.  *Id.* ¶ 35.  Later that day, Blanco met with the Mayor, who said that Kelly's comments were wrong and unethical.  *Id.* ¶ 37.  Blanco was given a formal interview the same day, at which time it was noted that he

needed to officially register for the Building Codes Official Class.  *Id.* ¶ 40.  That night, Blanco formally registered and paid for the course with his own money, proof of which he provided to City Hall.  *Id.* ¶¶ 41-42.  While at City Hall, Blanco received and signed a letter dated December 31, 2019, from the Managing Director regarding a "'Conditional Offer of Employment' - Chief Building Official."  *Id.* ¶ 42 and Ex. A.  The letter states, *inter alia*, that the official start date is January 2, 2020, and is contingent upon Blanco's successfully obtaining four certifications within six months of his transfer to the new position as the Chief Building Official.  *Id.*

On January 2, 2020, Blanco began his new position.  *Id.* ¶ 44.  Blanco had to collect his possessions from his former work area and saw his former coworkers, who knew he got the job. *Id.*  Blanco alleges that he "sensed their animosity and resentment."  *Id.*  Instead of congratulations, Blanco received more "Ass-Kisser" comments from the older white coworkers. *Id.*  Later that day, Blanco encountered the former acting Building Codes Official, who "loudly began to curse and rant about how messed up it was that [Blanco] was hired . . . and that [Blanco] was 'not going to be his boss.'"  *Id.* ¶ 45.  Over the following few days, Blanco "received the silent treatment [and n]o white employees were willing to share any information with him related to his work."  *Id.* ¶ 46.

The animosity, which Blanco discussed with the Head of Community Development, continued.  *Id.* ¶ 48.  On or about January 15 or 16, 2020, the City got an emergency call about a building collapse.  Blanco asked an employee to go check into the problem, but the employee did not respond and acted as if Blanco did not exist, ignoring direct questions.  *Id.* ¶ 49.  Blanco reported the incident to the Head of Community Development, and they agreed the employee would be written up for insubordination.  *Id.*

On January 20, 2020, a federal holiday, the Reading Fire Marshall informed Blanco that the entire front of a row home was collapsing. *Id.* ¶ 50.  Blanco called the inspectors, who were paid to be on call every day, but only one white mechanical inspector answered - none of the other four white building inspectors answered Blanco's call, texts, or voicemail messages. *Id.* Blanco was forced to reach out to Kelly, who was then the Acting Managing Director, but Kelly did not respond until after 8:00 p.m. *Id.* ¶ 51.  The following day, an older white building inspector pulled Blanco's name off the acting Building Codes Official list for Reading. *Id.* ¶ 52.

On January 23, 2020, Blanco informed LuAnn DeFranco-Culp, the new Director of Human Resources, of the alleged discrimination problems with which he had been dealing. *Id.* ¶ 54.  On January 24, 2020, Culp told Blanco to meet her in her office. *Id.* ¶ 55.  When Blanco arrived, both Culp and Kelly were present and they fired Blanco. *Id.*  Blanco asked them to reconsider. *Id.* ¶ 57.  Culp and Kelly responded that he could wait a couple weeks and reapply for his old job. *Id.* ¶ 57.  Blanco expressed his disagreement with the situation and stated that he would pass the Building Codes Official certification exam in a few weeks.[2] *Id.*  Blanco informed Culp and Kelly that the situation caused him stress and that he was seeing a therapist.[3] *Id.* Blanco stated that he had 210 hours of accumulated sick time, to which they responded that Blanco could have "2 weeks of sick time and that [he] should look into FMLA." *Id.*  Culp and Kelly had Blanco immediately draft an email requesting permission to "Check into the FMLA," but then stripped him of his keys and phone and had him escorted out of City Hall. *Id.*

---

[2]    On or about February 7, 2020, Blanco passed the Building Codes Official exam, which permitted him to obtain one of the required certifications.  Am. Compl. ¶ 43 and Ex. B.

[3]    Blanco alleges that he informed Defendant on "more than one occasion that he was seeing a therapist, the last time within minutes of being terminated.  Am. Compl. ¶ 58(B).

Blanco received a letter dated January 24, 2020, rescinding his conditional offer of employment.  *Id.* ¶ 61 and Ex. C.  The subject line of the letter states: "RE: Recission of Conditional Offer of Employment."  *Id.*  The letter, signed by Culp on January 23, 2020, states:

> We regret to inform you that the offer of Chief Building Official for the City of Reading has been rescinded. While reviewing your offer we found that the process followed was outside the protocols of the City Personnel Code, Chapter 70.
>
> The qualifications for Chief Building Officer are to possess 4 certifications . . . on day one so that you may carry out the functions of your position. Since you did not possess these certifications upon your appointment we have to fill this position with a qualified person.
>
> You are encouraged to reapply for your previous position in Public Works as Tradesman-Carpenter or any other position posted, including in the Building & Trades department once the certifications are obtained.

*Id.*

Blanco alleges that Culp is a policymaker, who determines what procedures and rules are given effect in the City of Reading.  *Id.* ¶ 55.  Blanco alleges that Kelly is also a policymaker and makes all decisions regarding the termination of non-department heads in the City of Reading. *Id.*  Blanco alleges that Kelly's decisions are final and unreviewable.  *Id.*  Blanco further alleges that Culp and Kelly created a reasonable accommodation when they granted him two weeks of sick time and advised him to look into FMLA.  *Id.* ¶ 57.  Blanco alleges that City of Reading Personnel Code, Chapter 70 does not invalidate his employment contract and, regardless, any misinterpretation of the Code by the City of Reading was a unilateral mistake for which Blanco bears no responsibility.  *Id.* ¶ 57.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss under Rule 12(b)(6)

In rendering a decision on a motion to dismiss, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).  Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim.  *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").  The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B.     42 U.S.C. § 1983 and Monell[4]**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The first step for the court analyzing a claim under § 1983 "is to identify the exact contours of the underlying right said to have been violated." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998).   The court must determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *See Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *Id.*). Section "1983 is not itself a source of substantive rights, but merely provides a method for

---

[4]     *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotations omitted).

Further, a "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Under *Monell*, a local government entity may be liable under 42 U.S.C. § 1983 if the plaintiff can show either: (1) an employee acted pursuant to a formal policy or a standard operating procedure; (2) the alleged violations were taken by a person with policy-making authority; or (3) an official with such authority has ratified the unconstitutional actions of a subordinate. *See Phillis v. Harrisburg Sch. Dist.*, 430 F. App'x 118, 123 n.7 (3d Cir. 2011). "[A] municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 at 691. "[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694-95). "[I]t is when execution of a [municipality's] policy[5] or custom,[6] whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) ("Mere assertion of an

---

[5]     "A municipal policy, for purposes of Section 1983, is a statement, ordinance, regulation, or decision officially adopted and promulgated by a government body's officers." *Torres v. City of Allentown*, No. 07-1934, 2008 U.S. Dist. LEXIS 50522, at *10-11 (E.D. Pa. June 30, 2008) (citing *Monell*, 436 U.S. at 690).
[6]     A custom, although not authorized by written law, has the force of law because it is such a permanent and well-settled practice. *Monell*, 436 U.S. at 690.

entitlement to relief, without some factual 'showing,' is insufficient under Fed. R. Civ. P. 8(a)(2).").  A "policy cannot ordinarily be inferred from a single instance of illegality. . . ." *Losch v. Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984).

Additionally, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  The fact that the individual "-- even a policymaking official -- has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986).  "[W]hether an official had final policymaking authority is a question of state law." *Id.* ("We hold that municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

## C.    Fourteenth Amendment- Equal Protection

To state a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, the plaintiff must establish: (1) the existence of purposeful discrimination; and (2) the defendant's personal involvement in this discrimination. *See Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citing *Andrews v. Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)).  The plaintiff must demonstrate that he/she "received different treatment from that received by other individuals similarly situated." *Andrews*, 895 F.2d at 1478.  Such disparate treatment must be based upon membership in a protected class (race, gender, etc.).  *See Shuman*, 422 F.3d at 151.  "Personal involvement exists

where the defendant engaged in the purposeful discriminatory conduct himself or knowingly acquiesced to it." *Dowling v. Commonwealth Liquor Control Bd.*, No. 88-7568, 1992 U.S. Dist. LEXIS 17438, at *20-21 (E.D. Pa. Oct. 26, 1992).

### D.    Fourteenth Amendment- Due Process

The Fourteenth Amendment of the Constitution restricts a state from "depriving persons of life, liberty, or property without due process of law."  U.S. Const. Amend. XIV, § 1.  To state a violation of procedural due process under 42 U.S.C. § 1983, a two-part analysis is applied: (1) whether the individual's interest is protected under the Fourteenth Amendment as life, liberty, or property, and (2) whether the pre-deprivation procedures provided complied with due process of law. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).  Procedural due process adapts to the situation at hand.  *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (holding that due process is flexible for the situation and that pre-deprivation hearings need not always be held).

### E.    Rehabilitation Act, Section 504 - Discrimination

 "The Rehabilitation Act forbids employers from discriminating against persons with disabilities in matters of hiring, placement, or advancement."  *Shiring v. Runyon*, 90 F.3d 827, 830-31 (3d Cir. 1996).  The *McDonnell Douglas* framework is applicable to discrimination claims under the Rehabilitation Act.  *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under the *McDonnell Douglas* burden-shifting paradigm, the plaintiff must first make a prima facie showing of discrimination.  *See Wishkin*, 476 F.3d at 185.  "A prima facie case of disparate treatment under the Rehabilitation Act requires proof that the plaintiff is [1] disabled, [2] qualified to perform the essential functions of the job, with or without reasonable accommodations, and [3] suffered an

adverse employment action due to discrimination." *Gillette v. Donahoe*, 622 F. App'x 178, 181 (3d Cir. 2015); *Shiring*, 90 F.3d at 831.

The standards used to determine whether Section 504 has been violated in a complaint alleging employment discrimination are the same as the standards applied under the Americans with Disabilities Act of 1990 ("ADA").  29 U.S.C. § 794(d).  "A person qualifies as 'disabled' under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Keyes v. Catholic Charities of the Archdiocese of Phila.*, 415 Fed. Appx. 405, 409 (3d Cir. 2011) (quoting 42 U.S.C. § 12102(2)).  *See also* 29 U.S.C. § 705(20)(B). "Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  45 CFR 84.3(j)(2)(ii). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  To prevail, the "plaintiff would have to show that his employer misinterpreted information about his limitations to conclude that he was unable to perform a 'wide range or class of jobs.'" *Keyes* 415 F. App'x at 410.  "Simply alleging that an employer knew about a disability is not sufficient to demonstrate that the employer regarded the employee as disabled." *Bucks County Court of Common Pleas*, No. 13-0689, 2014 U.S. Dist. LEXIS 41469, at *24-25 (E.D. Pa. Mar. 28, 2014) (determining that the plaintiff, although alleging that she made her employer aware of her ADHD, depression, and anxiety, failed to set forth any facts to demonstrate that her employer regarded her as disabled (citing *Keyes*, 415 Fed. Appx. at 410).  The "plaintiff must show that the

employer believed that a major life activity was substantially limited by the plaintiff's

impairment." *Popko v. Penn State Milton S. Hershey Med. Ctr.*, No. 1:13-cv-01845, 2014 U.S.

Dist. LEXIS 95486, at *16 (M.D. Pa. July 14, 2014).

"[T]he burden is on the employee to prove that he is an 'otherwise qualified' individual."

*Shiring*, 90 F.3d at 832 (quoting *Buckingham v. United States*, 998 F.2d 735, 739-40 (9th Cir.

1993)). "When the employee contends that he would be otherwise qualified with reasonable

accommodation, it falls to the employee to make at least a facial showing that such

accommodation is possible." *Id.*

### G.      Rehabilitation Act, Section 504 - Retaliation

"To establish a prima facie case of retaliation. . ., a plaintiff must show: (1) protected

employee activity; (2) adverse action by the employer either after or contemporaneous with the

employee's protected activity; and (3) a causal connection between the employee's protected

activity and the employer's adverse action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494,

500 (3d Cir. 1997). *See also Ozlek v. Potter*, 259 F. App'x. 417, 421-22 (3d Cir. 2007) (applying

the framework for analyzing a retaliation case under the ADA to a retaliation case under the

Rehabilitation Act). "To establish the requisite causal connection a plaintiff usually must prove

either (1) an unusually suggestive temporal proximity between the protected activity and the

allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a

causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

### H.      FMLA- Retaliation

"To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) [he]

invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision,

and (3) the adverse action was causally related to [his] invocation of rights." *Lichtenstein v.*

*Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 301-02 (3d Cir. 2012).  "The requisite causal

connection can be established by (1) temporal proximity between the protected activity and the

adverse employment action, (2) circumstantial evidence of a 'pattern of antagonism' following

the protected conduct, or (3) where the proffered evidence, looked at as a whole, suffices to raise

the inference."  *Innella v. Lenape Valley Found.*, No. 14-2862, 2015 U.S. Dist. LEXIS 171671,

at *29-30 (E.D. Pa. Dec. 23, 2015) (quoting *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 177

(3d Cir. 1997))).

## I.    Breach of Contract

"Under Pennsylvania law, a plaintiff must demonstrate the existence of each of the

following elements to establish a breach of contract claim: (1) the existence of a contract; (2)

breach of a duty imposed by the contract; and (3) damages caused by the breach."  *Ruple*

*Builders, Inc. v. Brackenridge Constr. Co.*, No. 2:17-cv-00004, 2019 U.S. Dist. LEXIS 1316, at

*11-12 (W.D. Pa. Jan. 4, 2019) (internal quotations omitted).  "Pennsylvania courts apply the

'plain meaning rule' of interpretation of contracts which assumes that the intent of the parties to

an instrument is embodied in the writing itself, and when the words are clear and unambiguous[7]

the intent is to be discovered only from the express language of the agreement."  *Hullett v.*

*Towers, Perrin, Forster & Crosby*, 38 F.3d 107, 111 (3d Cir. 1994) (internal quotations omitted).

## J.    Wrongful Termination

"In general, there is no non-statutory cause of action for an employer's termination of an

at-will employment relationship."  *Reuther v. Fowler & Williams, Inc.*, 86 A.2d 119, 120 (Pa.

---

[7]    "A contract provision is ambiguous if it is susceptible of two reasonable alternative
interpretations.  Where the written terms of the contract are not ambiguous and can only be read
one way, the court will interpret the contract as a matter of law."  *Hullett*, 38 F.3d at 111
(internal citation omitted).

Super. 1978) (citing *Geary v. United States Steel Corp.*, 319 A.2d 174 (Pa. 1974)).  "The action

for wrongful discharge in Pennsylvania was judicially established by [the Pennsylvania]

Supreme Court in the case of *Geary v. United States Steel Corporation*, 319 A.2d 174 (Pa.

1974)."  *Phillips v. Babcock & Wilcox*, 503 A.2d 36, 37 (Pa. Super. 1986) (explaining that

"implicit in the holding [in *Geary*] is that an employee at-will can maintain a wrongful discharge

action where a clear mandate of public policy has been violated by the termination).  In *Geary*,

the court "indicated that where a clear mandate of public policy is violated by the termination,

the employer's right to discharge may be circumscribed."  *Reuther*, 386 A.2d at 120 (citing

*Geary*, 319 A.2d at 180).  "In Pennsylvania, an employer may terminate an employee without

cause provided that the dictates of public policy, contract, or a statutory provision do not prohibit

such termination."  *Gillispie v. Regionalcare Hosp. Partners Inc.*, 892 F.3d 585, 597 (3d Cir.

2018) (internal quotations omitted).

## IV.    ANALYSIS

### A.    Counts I and II- Fourteenth Amendment

The City first argues that the Fourteenth Amendment claims should be dismissed because

the Amended Complaint fails to state a Monell claim.  *See* Mot. 8-9, ECF No. 9.  The City

asserts that despite Blanco's allegations that Culp and Kelly were policymakers, there is nothing

in the Amended Complaint alleging their actions were in furtherance of a policy or custom of the

City.  *See id.*  Blanco responds that a deliberate choice by a governmental policymaking official

constitutes government policy if the official has been granted final decision-making authority

concerning the relevant area or issue and that his burden of proving an actor has policymaker

status is delayed until after discovery.  *See* Resp. 17-18, ECF No. 12.  He further argues that the

Amended Complaint alleges Kelly directed Blanco's termination, no one else could or did

review Kelly's decision, and the termination occurred in the context of repeated allegations of a racially hostile environment.  *See id.*

Under *Monell*, a local government entity may be liable under 42 U.S.C. § 1983 if the plaintiff can show the alleged violations were taken by a person who was a policy-making official.  *See Phillis*, 430 F. App'x at 123 n.7.  However, the policy-making official, such as the mayor, "must be implementing a well-settled and permanent custom."  *Terry v. Yeadon Borough*, No. 12-6205, 2013 U.S. Dist. LEXIS 174584, at *4-5 (E.D. Pa. Dec. 13, 2013) (dismissing the amended complaint alleging a single instance of racial discrimination because although the plaintiff alleged there was a Borough policy against interracial relationships, the plaintiff had not pleaded sufficient facts to show discouragement of interracial relationships was established).  Alternatively, the policymaking official must be responsible for establishing final government policy respecting the activity at issue to bind the municipality.  *See Pembaur*, 475 U.S. at 483 and n.12 (commenting that simply because an official has discretion to hire and fire employees, his decisions would not give rise to Monell liability unless he is also the official responsible for establishing municipal employment policy for his decisions respecting employment to rise to municipal liability).

There are no allegations in the Amended Complaint of a well-settled custom, practice, or a policy.  Further, although Kelly had final authority for hiring and firing decisions, he did not have policy-making authority.  *See* Reading Code of Ordinances § 406(3) (listing the powers and duties of the Managing Director).  Rather, the relevant policy-making authority lies with the Mayor.  *See id.* § 308(i) (stating that the mayor is "responsible for the establishment and development of administrative policy to be implemented by the Managing Director").  The Amended Complaint alleges that the Mayor thought Blanco would be "great" for the position

and that the City was in "good hands" with Blanco.  *See* Am. Compl. ¶¶ 35-38.  Consequently, Blanco's Monell claims, Counts I and II, fail.  In the unlikely event Blanco could amend his allegations to correct this deficiency,[8] this Court nevertheless reviews the claims.

### 1.    Equal Protection Clause

The City argues that the Amended Complaint does not sufficiently allege facts to state a hostile work environment claim pursuant to the Fourteenth Amendment because (1) it is void of any allegations demonstrating that other employees similarly situated to Blanco were subjected to different treatment, and (2) it lacks any allegations of personal liability.  *See* Mot. 10.  Blanco objects by citing cases setting out the applicable standards and then repeating allegations in the Amended Complaint.  *See* Resp. 19-21.

What is noticeably absent from the Amended Complaint are any factual allegations that the alleged discriminatory comments were related to Blanco's race.  Although the alleged discriminatory behavior came from white coworkers, all such persons were also older.  Blanco does not allege, however, that the hostile work environment was due to his age, nor would the allegations support an age-based discrimination claim any more than they do a race-based discrimination claim.  Rather, the fact that the coworkers were all older, combined with the fact Blanco did not yet have all the certifications required to be a Building Code Official and the non-race nature of the comments: "Ass-Kisser," suggest that his coworkers' behavior, who Blanco alleges were resentful, was due to Blanco's lack of qualifications for the job.  The need for Blanco to show that he received "different treatment from that received by other individuals

---

[8]    *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile").

similarly situated," *Andrews*, 895 F.2d at 1478, is therefore particularly important in this case. Blanco has not made any such allegations. *See Leibert v. Phila. Hous. Auth.*, No. 10-5412, 2011 U.S. Dist. LEXIS 26254, at *11 (E.D. Pa. Mar. 14, 2011) (dismissing the equal protection claim based on a hostile work environment because the plaintiff did not allege she was treated differently than anyone else). Additionally, Blanco has failed to allege any facts suggesting an official policy or a persistent and widespread practice that would hold the City liable for the acts of a few City employees. *See Williams v. Pennridge Sch. Dist.*, No. 15-4163, 2018 U.S. Dist. LEXIS 205957, at *37-38 (E.D. Pa. Dec. 4, 2018) (dismissing the Fourteenth Amendment hostile work environment claim against the school district). The equal protection claim, Count I, is dismissed without prejudice.

In an abundance of caution, this Court grants Blanco one final opportunity to amend the complaint to allege additional factual allegations sufficient to state a claim.

### 2.      Due Process Clause

The City asserts that Blanco does not have a property interest in continued public employment that would trigger the procedural protections of the Fourteenth Amendment Due Process Clause. *See* Mot. 10-13. Blanco disputes this argument contending, *inter alia*, that he had a property interest in his employment because the offer letter guaranteed the position of Chief Building Official as long as he obtained the required certifications within six months. *See* Resp. 23 (citing Am. Compl. Ex. A).

A property interest must be created by an independent source such as state law, but "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1398-99 (3d Cir. 1991) (internal citations omitted) ("It is neither

workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim.").  Under Pennsylvania law, a public employee "serves at the pleasure of [his] employer and thus has no legitimate entitlement to continued employment." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005); *Leibert*, 2011 U.S. Dist. LEXIS 26254, at *11-14 (dismissing the procedural due process claim because the plaintiff had not alleged she was anything more than an at-will employee).  "[O]nly two types of contracts have been found to be property protected by the Fourteenth Amendment. The first is a contract that confers a protected status, such as a tenure contract providing for permanent employment. The second is a contract explicitly providing that it may be terminated only for cause." *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 401 (3d Cir. 1992).

The employment letter that allegedly created the contract at issue does not indicate that even if Blanco obtained the required certifications his employment would be permanent or that he could only be terminated for cause.  Moreover, the subject line of the employment letter reads: "RE: 'Conditional Offer of Employment' - Chief Building Official."  *See* Am Compl. Ex. A.  It is therefore clearly a "conditional" offer of employment, which is not protected by the Fourteenth Amendment.  *See Tropiano v. Pa. State Police*, No. 06-1569, 2006 U.S. Dist. LEXIS 50312, at *9 (E.D. Pa. July 24, 2006) (dismissing the § 1983 claim based on an alleged due process violation because the plaintiff received only a conditional offer of employment because there is no Fourteenth Amendment property interest in a conditional offer of employment).  As to Blanco's suggestion that his employment was guaranteed for at least six months, which is the period of time he was given to obtain the required certifications, the letter does not support his position that this time was guaranteed.  *See Marsh v. Boyle*, 530 A.2d 491, 494 (Pa. Super. 1987) (holding that "the employer's assurances that Appellant would be working as publisher 'for at

least two years' was not sufficiently definite to take the agreement out of the at-will employment

presumption"). Consequently, Blanco did not have a protected interest in his job for the City and

Count II, asserting a procedural due process violation under the Fourteenth Amendment, is

dismissed with prejudice.[9]

### B.    Counts III and IV- Rehabilitation Act

### 1.    Discrimination

The City asserts that Blanco fails to allege a disability as defined under the Rehabilitation

Act. *See* Mot. 14-17. The City contends Blanco merely refers to seeing a therapist and to stress,

but fails to allege any limited daily life activities that were impaired as a result of the stress. *See*

*id.* Additionally, the City argues that Blanco was not "otherwise qualified" for the position of

Chief Building Official, nor does he allege the same. *See id.* In response, Blanco does not allege

that he is disabled or that any life activities were substantially impaired by his stress, but merely

attempts to distinguish two of the cases cited by the City. *See* Resp. 24-26. Blanco also

contends that the City's argument that he is not qualified is "absurd" because he was selected for

the position, but again fails to allege that he was in fact qualified. *See id.*

Blanco has completely failed to allege or to even suggest that he has a disability. His

stress, which does not impact any major life activity, let alone substantially limit the same, is

insufficient to support a claim under the Rehabilitation Act. *See Kiser v. Potter*, No. 3:10-cv-22,

2012 U.S. Dist. LEXIS 47631, at *19-21 (W.D. Pa. Apr. 4, 2012) (finding that the plaintiff's

"severe stress, anxiety, and depression" that he "allegedly suffered as a result on-the-job

harassment" and had him out of work for nine months was transitory in nature and did not

---

[9]      This Court finds that leave to amend would be futile.

substantially limit a major life activity).  There is also absolutely no evidence that Blanco was

terminated due to any disability.  Count III is dismissed with prejudice.[10]

>    **2.    Retaliation**

The City repeats its arguments summarized above for why Blanco has also failed to state

a retaliation claim under the Rehabilitations Act.  *See* Mot. 17-21,  In addition, the City states

that an employer's duty to accommodate arises only where the employee requires an

accommodation in order to perform the essential functions of his job.  *See id.* (citing *Beishl v.*

*Cty. of Bucks*, 2018 U.S. Dist. LEXIS 216551 *8 (E.D. Pa. Dec. 27, 2018)).  Further, because

Blanco did not request an accommodation until after the decision to terminate him had already

been made, any action by the City could not have been in retaliation.  *See id.*  In response,

Blanco refers to his claims of harassment, states that he had informed the City more than once

that he was "seeing a therapist" and that within minutes of his last advising the City he was

"seeing a therapist," he was terminated.  *See* Resp. 26-27.

Initially, the Court notes the Rehabilitation Act only forbids retaliation in relation to

activity protected by the Rehabilitation Act (disability).  Blanco's reliance on his complaints of

racial harassment is therefore misplaced.  Regardless, the retaliation claim fails for the reasons

set forth in the previous section.  Although Blanco alleges he advised the City on some other

previous but unspecified occasions that he was seeing a therapist, there is absolutely no evidence

that his termination was connected to the same.  Further, on January 24, 2020, Blanco did not

mention he was seeing a therapist until after being informed he was terminated.[11]  Blanco has

---

[10]    This Court finds that leave to amend would be futile.

[11]    Blanco alleges that he met with Culp and Kelly on January 24, 2020, at which time he
was terminated.  Am. Compl. ¶ 5 5.  However, Blanco's termination letter was signed by Culp on
January 23, 2020.  *See id.* Ex. C.  If these dates are correct then Blanco was terminated a full day
before mentioning that he was seeing a therapist and requesting FMLA leave.  If these dates are

therefore failed to show a causal connection between any protected activity under the Rehabilitation Act and any adverse action.  Moreover, Blanco does not allege that he asked the City to accommodate his disability.  Rather, he alleges that after being terminated and explaining to Culp and Kelly that he had 210 accumulated hours of sick leave, they offered Blanco two weeks of sick time and told him he should look into FMLA leave.  *See* Am. Compl. ¶57(D). Blanco alleges "this"- the offer by Culp and Kelly- created a reasonable accommodation.  *See id.* This suggestion is meritless.  For all these reasons, Count IV is dismissed with prejudice.[12]

### C.    Count V- FMLA

The City argues that because Blanco did not request FMLA leave until after learning of his termination, his FMLA request was not the cause of his termination and the City's decision did not interfere with his FMLA request.  *See* Mot. 19-21.  In response, Blanco suggests that after he was terminated and immediately sought reconsideration, his request was granted and his employment was extended by two weeks, which is the amount of sick time he was going to receive in exchange for 210 accumulated sick day.  *See* Resp. 27-29.  He suggests that he then sought FMLA leave, but was terminated a second time when he was stripped of his keys and escorted from the building.  *See id.*

As mentioned in footnote 11, Blanco's suggestion of a second termination within minutes of the first is wholly without merit.  His suggestion that he was terminated a second time for

---

incorrect and the letter was signed the same day as the meeting, the allegations nevertheless show that Blanco was advised of his termination before stating that he was seeing a therapist and before requesting FMLA leave, which were only discussed when Blanco sought reconsideration of the termination decision.  *See id.* ¶ 57.  Blanco's suggestion, which is discussed further below, that his employment was extended by two weeks, that he was then terminated again only minutes later after being instructed to request FMLA leave, and that this alleged second termination was the result of his FMLA leave request, is meritless.

[12]     This Court finds that leave to amend would be futile.

seeking FMLA leave, which he only did upon the instruction of Culp and Kelly, has even less of a foundation.  Rather, the allegations make clear that Blanco was terminated prior to seeking FMLA leave.  His retaliation claim necessarily fails.  Count V is dismissed with prejudice.[13]

### D.   Count VI - Breach of Contract

The City argues that Blanco fails to state a claim for breach of contract because a conditional offer of employment does not form the basis for a breach of contract claim.  *See* Mot. 21-22.  The City further asserts that even if Blanco did have an employment contract with the City, he failed to demonstrate that his alleged employment contract provided for more than at-will employment, which is necessary to support a breach of employment contract claim.  *See id.* 23-25.  Blanco contends that because the contract guaranteed him six months in which to obtain the specified certifications, the City was obliged to employ him for at least six months.  *See* Resp. 29-32.  The City argues, on the other hand, that the alleged contract does not contain a specified and definitive period of time of employment, nor does it contain assurances that Blanco would not be terminated before the six-month limit to obtain certifications, nor does it promise that Blanco could only be terminated for good cause.  *See* Mot. 25-26.

"Under Pennsylvania law there is a strong presumption that employment is at-will and terminable by either party for any reason, or even no reason at all, unless there is a statutory or contractual provision to the contrary."  *Buckwalter v. ICI Explosives USA*, No. 96-CV-4795, 1998 U.S. Dist. LEXIS 276, at *13 (E.D. Pa. Jan. 8, 1998) (citing *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 176 (Pa. 1974)).  "A Plaintiff may rebut the at-will presumption through evidence that: (1) the employee had a contract with the employer which stated that he would be employed for a specified and defined period of time; (2) the employee had a contract which stated that she could

---

[13]      This Court finds that leave to amend would be futile.

only be fired for cause; (3) the employee gave sufficient additional consideration other than the employee's normal services such that the he could not be discharged without just cause for a reasonable amount of time; or (4) an applicable public policy exception applies." *Buckwalter*, 1998 U.S. Dist. LEXIS 276, at *13-14.  "Pennsylvania courts have consistently rejected attempts to rebut the employment at-will presumption where an alleged agreement did not specifically state a definite term of employment." *Id.* (citing *Scott v. Extracorporeal, Inc.*, 545 A.2d 334, 336-37 (Pa. Super. 1988)).

The letter on which Blanco relies states: "this offer of employment is contingent upon your successfully obtaining the following certifications within six (6) months of the transfer to your new position. . . .:"  Am. Compl. Ex. A.  This time reference is not sufficiently definite to rebut the presumption of an at-will contract.  *See Marsh*, 530 A.2d at 494 (holding that "the employer's assurances that Appellant would be working as publisher 'for at least two years' was not sufficiently definite to take the agreement out of the at-will employment presumption").  Moreover, the letter was merely a "Conditional Offer of Employment"  *See* Am. Compl. Ex. A.  "The conditioning of future employment upon satisfactory performance is too ambiguous to overcome the at-will presumption."  *Bereswill v. Corestates Financial Corp.*, 1989 U.S. Dist. LEXIS 1826, at *2-3 (E.D. Pa. Feb. 23, 1989) (citing *Darlington v. General Electric*, 504 A.2d 306, 312 (Pa. Super. 1986).  Blanco's reliance on promissory estoppel also fails to save his claim.  *See Chand v. Merck & Co.*, No. 19-0286, 2019 U.S. Dist. LEXIS 125867, at *9 (E.D. Pa. July 26, 2019) ("Under Pennsylvania law, at-will employees cannot bring an action for promissory estoppel.").

Accordingly, Count VI, for breach of contract is dismissed with prejudice.[14]

---

[14]     This Court finds that leave to amend would be futile.

### E.       Count VII - Wrongful Termination

The City asserts that Blanco's claim fails for two reasons: (1) Blanco failed to allege that his termination violated public policy, and (2) the allegations are based on racial discrimination, a violation of the Rehabilitation Act, and his request for leave under the FMLA, all of which have statutory avenues for relief.  *See* Mot. 29-30; Reply 3-5, ECF No. 15.  Blanco responds that he has satisfied the public policy exception and that courts have permitted wrongful termination claims even when statutory remedies exist.  *See* Resp. 36-39.

"[A]s a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship."  *Weaver v. Harpster*, 975 A.2d 555, 562 (Pa. 2009).  A limited exception to this general rule occurs "where discharges of at-will employees would threaten clear mandates of public policy."  *Id.* (internal quotations omitted).  However, "Pennsylvania law does not recognize a common law cause of action for violating public policy if a statutory remedy exists."  *Gillispie v. Regionalcare Hosp. Partners Inc.*, 892 F.3d 585, 597 (3d Cir. 2018).

Initially, to the extent that Blanco has failed to allege sufficient facts to support his claims, as discussed he has also failed to sufficiently allege that his termination violated public policy.  Moreover, Blanco has a statutory remedy to raise each of his claims.  *See Petti v. Ocean Cty. Bd. of Health*, 831 F. App'x 59, 64-65 (3d Cir. 2020) (holding that the because the wrongful termination claim was based on the same facts as her discrimination and retaliation claims, the claim would not protect any additional interest beyond the protections of the ADA and Title VII).  Consequently, Count VII is dismissed with prejudice. [15]

---

[15]     This Court finds that leave to amend would be futile.

**V.      CONCLUSION**

The allegations in the Amended Complaint are insufficient to support the claims.  Blanco is granted leave to amend Count I, but all other claims are dismissed with prejudice because leave to amend would be futile.

A separate order follows.


BY THE COURT:


/s/ Joseph F. Leeson, Jr.
JOSEPH F. LEESON, JR.
United States District Judge